**E-FILED on**   12/1/05

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAMES JAMESON,<br><br>             Plaintiff,<br><br>   v.<br><br>JO ANN B. BARNHART,<br>Commissioner of Social Security,<br><br>             Defendant. | No.  C 04-00609  RMW<br><br>ORDER REMANDING CASE<br><br>**[Re: Docket No. 12 ]** |

## I. INTRODUCTION

Plaintiff James Jameson ("Jameson") brings this action under 42 U.S.C. § 405(g) ("section 405(g)") to obtain review of the Commissioner of Social Security's decision denying his claim for Supplemental Security Income benefits. On August 29, 2001, Jameson filed a claim for such benefits, alleging that he became disabled on April 6, 1999 due to back pain and mental problems. Administrative Transcript ("Tr.") 25. On March 12, 2002 the Social Security Administration ("SSA") denied Jameson's application. Tr. 51-54. The SSA denied his request for reconsideration on November 22, 2002. Tr. 56-59. An Administrative Law Judge ("ALJ") held a hearing on May 14, 2003. Tr. 25. On May 29, 2003 the ALJ

denied Jameson's claim. Tr. 25-30. The SSA Appeals Council denied Jameson's request for review on December 16, 2003. Tr. 3-5.

Jameson filed a complaint in this court on February 12, 2004. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the court remands the case.

## II. STATEMENT OF FACTS

Jameson was approximately thirty-five years old when he applied for benefits. Tr. 25. He has a limited education. He claims that he was placed in special education classes in grade school. Tr. 175. In addition, he dropped out of school in the 11th grade. *Id*. For about nineteen years, he worked as a gardener for a landscaping company. Tr. 95. This job entailed using equipment, such as a lawnmower, weed-eater, blower, rakes, pruners, and shearers. Tr. 96. During this time, he lived with his mother in a cottage behind his employer's house. Tr. 175. He then worked as a roofer for about eight months until he hurt his back. Tr. 180.

On September 23, 2002 Michelle Paquee, a vocational evaluator, conducted a one-day battery of tests on Jameson. Tr. 113-16. Ms. Paquee found that Jameson's vocabulary, comprehension, and math skills were roughly at the third grade level. Tr. 114. However, Ms. Paquee noted that Jameson scored in the 47th percentile on the "Raven" test: a non-verbal abstract reasoning and problem-solving exam. *Id*. In addition, Ms. Paquee reported that Jameson's SRA nonverbal test score placed him in the 54th percentile. *Id*. After interviewing Jameson, Ms. Paquee determined that a possible match between his capabilities and interests might include security or parking control work. Tr. 116. Ms. Paquee concluded that Jameson "does better in a one-on-one setting" and "appears to be most interested in practical, hands-on occupations with somewhat routine work duties." *Id*.

On April 14, 2003 Dr. Sheila Snyder, a licenced clinical psychologist, examined Jameson for the purpose of his benefits claim. Tr. 161-68. Dr. Snyder reported that Jameson has trouble following conversations and being in groups. Tr. 161. Dr. Snyder noted that Jameson felt that both his bosses at the landscaping and roofing job were "mean and abusive." Tr. 162. Dr. Snyder determined that Jameson (1) has a verbal IQ score of 61, (2) a performance IQ score of 65, and (3) a full scale IQ score of 59. Tr. 165. These results led Dr. Snyder to conclude that Jameson is mentally retarded. Tr. 163. According to

1 Dr. Snyder, Jameson would "have difficulty recalling instructions and work like procedures necessary for
2 employability" and would require "undue amounts of supervision."  Tr. 163-64.

## III.  LEGAL STANDARDS

To be eligible for Social Security disability benefits, the claimant must be disabled.  "A claimant bears the burden of proving that an impairment is disabling."  *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).  Disability is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An impairment for purposes of this definition "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In addition, a person is disabled only if the impairment is so severe as to preclude not only performance of his previous work, but also, considering his age, education, and work experience, performance of "any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The district court's review of the ALJ's decision is limited.  The Secretary's determination denying benefits will be upheld "if it is supported by substantial evidence and is based on the proper legal standards."  *See* 42 U.S.C. § 405(g); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993).  "The decision will be set aside, however, if the proper legal standards were not applied in weighing the evidence and making the decision even though the findings are supported by substantial evidence."  *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983).  The Ninth Circuit in *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997), defined "substantial evidence" and described the relevant standard of review:

> Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.  Where the evidence is susceptible to more than one rational interpretation, we must uphold the Commissioner's decision.

*Sandgathe*, 108 F.3d at 980 (internal citations and quotation marks omitted).

ORDER REMANDING CASE
NO. C 04-00609  RMW
PM

3

# IV.  DISCUSSION

## A. The Five-Step Sequential Evaluation of Disability

The Commissioner has established a five-step sequential evaluation process to follow in a disability case. 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. If so, the ALJ will find that the claimant is not disabled, and the claim will be denied. *Id.* §§ 404.1520(b), 416.920(b). Second, the ALJ determines whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. If not present, the ALJ will find that the claimant is not disabled, and the claim will be denied. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant is suffering from such an impairment, the ALJ compares the impairment with those in the Listing of Impairments, and if the impairment "meets or equals" an impairment on the Listing, disability is presumed and benefits are awarded. *Id.* § 404, Subpart P, App. 1; §§ 404.1520(d), 416.920(d). If not, the ALJ must determine, as a fourth step, whether the claimant has sufficient "residual functional capacity" to perform his past relevant work. If the claimant has sufficient residual functional capacity, the ALJ will find that the claimant is not disabled, and the claim will be denied. *Id.* §§ 404.1520(e), 416.920(e). Otherwise, if the claimant meets his burden of showing that he is unable to perform past relevant work, he has established a prima facie case of disability. *See Gamer v. Sec'y of Health and Human Services*, 815 F.2d 1275, 1278 (9th Cir. 1987). In step five, the burden shifts to the Commisioner to prove that the claimant, based on his age, education, work experience, and residual functional capacity, can perform other substantial gainful work. *Id.* §§ 404.1250(f), 416.920(f); *see also Bowen v. Yuckert*, 482 U.S. 137 (1987).

## B. The ALJ's Findings

The ALJ began by examining Jameson's alleged physical impairments. Tr. 26-27. The ALJ determined that Jameson had not engaged in substantial gainful activity since the alleged onset of his back pain. Tr. 29. In addition, the ALJ concluded that Jameson could not perform his past work. *Id*. However, the ALJ held that Jameson could perform "light exertional work." Tr. 26.

The ALJ then examined Jameson's alleged mental impairments. The ALJ noted that Ms. Paquee's testing had revealed that Jameson's vocabulary, reading comprehension, and math skills were low. Tr. 27.

1 However, the ALJ also reasoned that Jameson had done comparatively well on the Raven test and that his
2 SRA nonverbal reasoning test score "indicated solid general learning abilities." *Id*. The ALJ gave "minimal
3 weight" to Dr. Snyder's opinion. *Id*. The ALJ offered several criticisms of Dr. Snyder's opinion, including
4 that it (1) lacked longitudinal confirmation of consistently severe mental limitations, (2) did not include a
5 detailed mental examination, (3) failed to account for Jameson's "strong work history," and (4) conflicted
6 with Ms. Paquee's test results. Tr. 27-28.

7 The ALJ then inquired whether the Commissioner had shown whether Jameson could perform
8 other jobs in light of his age, education, vocational background, and maximum sustained work capacity. Tr.
9 29. The ALJ used Rules 202.17 and 202.18 of the Medical-Vocational Guidelines ("grids") of 20 C.F.R.
10 § 404, Subpart P, Appendix 2—which establish certain *per se* rules of disability—as a reference. Tr. 29.
11 Under those Rules, because Jameson qualifies as a "younger individual," he is "not disabled." The ALJ
12 adopted this conclusion.

### III. DISCUSSION

14 "The ALJ has a duty to develop the record in Social Security cases." *DeLorme v. Sullivan*, 924
15 F.2d 841, 849 (9th Cir. 1991). "In cases of mental impairment, this duty is especially important" and
16 "exists even when the claimant is represented by counsel." *Id*. The ALJ did not comply with that duty here.

17 The ALJ did not develop an adequate record with respect to Jameson's claim that he is mentally
18 retarded. "Mental retardation" is "a significantly subaverage general intellectual functioning with deficits in
19 adaptive behavior initially manifested during the developmental period (before age 22)." A claimant can
20 establish mental retardation in three ways that may be relevant to Jameson's case. *See* 20 C.F.R. Pt. 404 ,
21 Subpt. P, App. 1 § 12.05(A)-(D) ("section 12.05"). First, under section 12.05(B), a claimant must
22 establish (1) "[a] valid verbal, performance, or full scale I.Q. of 59 or less" and (2) onset of this disability
23 before age 22. Second, under section 12.05(C), a claimant must possess "[a] valid verbal, performance,
24 or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and
25 significant work-related limitation of function." *See Fanning v. Bowen*, 827 F.2d 631, 633 (9th Cir.
26 1987) (holding that "an impairment imposes a significant work-related limitation of function when its effect
27 on a claimant's ability to perform basic work activities is more than slight or minimal"). Third, under section
28

5
ORDER REMANDING CASE
NO. C 04-00609 RMW
PM

1   12.05(D), a claimant must prove that his IQ of 60 through 70 "result[s] in at least two of the following: [(1)
2   m]arked restriction of activities of daily living; or [(2) m]arked difficulties in maintaining social functioning; or
3   [(3) m]arked difficulties in maintaining concentration, persistence, or pace; or [(4) r]epeated episodes of
4   decompensation, each of extended duration."  The Secretary must use the lowest of the claimant's verbal,
5   performance, or full scale IQ scores. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(B)(4) ("where
6   more than one IQ is customarily derived from the tests administered . . . the lowest of these is to be used").
7           Dr. Snyder determined that Jameson's (1) verbal IQ score is 61, (2) performance IQ score is 65,
8   and (3) full scale IQ score is 59.  Tr. 162.  Thus, Jameson's full scale IQ score of 59 meets the first prong
9   of a Listed Impairment under sections 12.05(B), (C), and (D).  However, the ALJ did not examine the
10  other prongs of these tests.  *See* Tr. 29 (concluding, without explanation, that Jameson "does not have an
11  impairment or combination of impairments listed in, or medically equal, to one listed in Appendix 1, Subpart
12  P, Regulations No. 4").  Where a claimant fulfills a major criteria for several Listed Impairments, the ALJ
13  must provide *some* rationale for rejecting his claim.  *See Smith v. Barnhart*, 2003 WL 22862663 *4
14  (N.D. Cal. 2003) ("[a] mere statement that a claimant does not equal the listing is insufficient").  Courts
15  routinely remand cases where the ALJ appears to have overlooked the fact that the claimant might suffer
16  from a Listed Impairment.  *See, e.g., Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) (reversing
17  ALJ's decision because "it is not clear from [the] decision that he even considered whether Chunn met the
18  requirements for listing 12.05C"); *Soto v. Secretary of Health and Human Services*, 795 F.2d 219, 221-
19  22 (1st Cir. 1986) (reversing ALJ's decision where he "never indicated awareness that an IQ level of 59 or
20  less was a listed impairment").  Even if the ALJ correctly determined that Jameson's IQ scores were invalid,
21  he still had a duty to obtain accurate scores.  *See Kang v. Bowen*, 1989 WL 281938 *4 (N.D. Cal. 1989)
22  ("[i]f the ALJ was not satisfied that Ms. Kang's IQ scores were valid due to language and cultural factors,
23  the ALJ should have ordered other tests to permit the ALJ to make an informed decision").
24          The ALJ did articulate specific reasons for affording Dr. Snyder's diagnosis "minimal weight."  Tr.
25  27.  Nevertheless, even assuming that the ALJ could properly reject the IQ-score component of Dr.
26  Snyder's opinion by discounting the opinion in its entirety, his reasoning is insufficient.  First, because IQ
27  scores are empirical measures and thus less susceptible to manipulation than other indices of disability, an
28

6

ORDER REMANDING CASE
NO. C 04-00609  RMW
PM

ALJ must articulate precisely why he believes they are inaccurate. *See Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) ("[a]n ALJ cannot reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record"). This is especially true where, as here, the administrator affirmatively represents that the scores likely reflect the test-taker's true abilities. *Compare* Tr. 162 (Dr. Snyder stating that "[Jameson] displayed adequate motivation and was cooperative with testing" and thus "[t]he results are felt to be valid indications of this individual's present levels of functioning") *with Holmes v. Apfel*, 1999 WL 731769 *4 (N.D. Ill. 1999) (reversing ALJ's determination that IQ scores were inaccurate because, *inter alia*, "Dr. Jaffe, the examining physician, clearly indicated his belief that Holmes' IQ scores were accurate estimates of Holmes' intellectual potential").

To be sure, an ALJ may ignore a claimant's low IQ scores when the record establishes that he is capable of a wide range of everyday activity. For example, in *Hall v. Bowen*, 1989 WL 56415 (W.D. Pa. 1989), the claimant scored higher on one IQ test than on another. The ALJ rejected the lower score. *Id*. at *1. The district court affirmed, reasoning that the lower score was inconsistent with the fact that the claimant completed high school, reads the newspaper, holds a driver's license, washes dishes, takes out the trash, sweeps, vacuums, shops, attends church, goes to movies, and goes out to eat. *Id*. at *3. Nevertheless, such circumstances are not apparent here. The ALJ relied heavily on Jameson's work history to disregard Dr. Snyder's report:

> Dr. Snyder stated that [Jameson] had a brief and unsuccessful work history. It is noted that while [Jameson's] earnings record shows no or low earning for many years, [he] testified that he was 'paid under the table.' [Jameson's] Work History report shows that [he] had a strong 19-year work history including jobs as a roofer and gardener. As the medical evidence shows no deterioration in [Jameson's] medical condition, the ALJ finds that Dr. Snyder's conclusion that [Jameson] was unable to perform simple, repetitive work or was unable to recall work procedures is wrong.

Tr. 27-28. However, the mere fact that a claimant has held jobs, standing alone, does not belie a low IQ score. For example, in *Bailey v. Apfel*, 230 F.3d 1063 (8th Cir. 2000) the Eighth Circuit held that the ALJ erred by rejecting the claimant's IQ scores. The court reasoned that the scores were consistent with the claimant's lifestyle and work history:

> Furthermore, Bailey's daily activities and work history do not call into question the validity of the IQ results. Bailey has never lived independently and is dependent upon his wife and relatives to assist him. His daily activities were restricted to watching television and visiting with friends. He indicated on reports that he had trouble keeping

>    jobs because he was not fast, and his work history was limited primarily to working for his father.

*Id*. at 1065-66; *see also Larkin v. Heckler*, 1984 WL 62834 *4 (N.D. Cal. 1984) (claimant's work history was "consistent with his [low] test scores" even though he worked as deliveryman for seventeen years). Like the claimant in *Bailey*, Jameson did not work within traditional parameters. *See* Tr. 162, 175-77, 184-85 (Jameson performed menial gardening tasks for man with whom he and his mother lived, never interacted with customers, and was unable to hold down jobs at fast food restaurants or a thrift shop). Without citation to the record, the ALJ states that Jameson's "work[ ] as a roofer . . . require[d] more than simple, repetitive work." Tr. 28-29. No evidence appears to support this contention. *See* Tr. 97 (Jameson testified that his job as a roofer consisted only of lifting "barrels of shingles from [the] house to [the] truck all day"). Also, like the claimant in *Bailey*, Jameson cannot live independently. For example, Jameson testified that he has never cooked for himself, washed his own clothes, or performed household chores. Tr. 188-89. He explained that he spends a typical day "[w]atching cartoons." Tr. 189. The ALJ should have developed the record more before discounting Jameson's IQ scores.

In addition, the ALJ did not provide clear and convincing reasons for discounting Dr. Snyder's opinion. Dr. Snyder, a licensed psychologist, qualifies as an examining physician. "[T]he Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The Commissioner can reject an examining physician's opinion when it conflicts with another examining physician for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id*. Ms. Paquee, a vocational evaluator, is apparently not a psychologist or mental health professional. Thus, she lacks the requisite qualifications to refute Dr. Snyder's findings. *See* 20 C.F.R. § 916.913(a)(2) ("acceptable medical sources" include "[l]icensed or certified psychologists"). Because Dr. Snyder's opinion was "uncontradicted" within the meaning of *Lester*, the ALJ must provide a clear and convincing justification for discounting it. As noted above, this was not done.

Finally, the ALJ erred by relying on the grids to determine that Jameson was not disabled based on the record before him. Under Ninth Circuit precedent, an ALJ may use the grids "when a claimant suffers only from exertional limitations." *Holohan v. Massanari*, 246 F.3d 1195, 1209 (9th Cir. 2001).

8
ORDER REMANDING CASE
NO. C 04-00609 RMW
PM

"Exertional limitations are strength-related limitations." *Cooper v. Sullivan*, 880 F.2d 1152, 1156 n.1 (9th Cir. 1989). Mental impairments are non-exertional limitations. *See Beecher v. Heckler*, 756 F.2d 693, 695 (9th Cir. 1985). An ALJ cannot use the grids where "a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations." *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 577 (9th Cir. 1988). Instead, an ALJ must hear the testimony of a vocational expert. *See Tackett v. Apfel*, 180 F.3d 1094, 1104 (9th Cir. 1999) ("[b]y concluding that Tackett was not disabled without the aid of the testimony of a vocational expert, the ALJ committed reversible error"). Here, Jameson alleged both that he suffered from back problems and mental retardation. Although the ALJ concluded that Jameson's back problem was "severe" and that he could not perform his past work, he did not consider whether Jameson's mental impairments significantly limited his work capacity. *See* Tr. 29. The ALJ should have made this determination before relying solely on the grids.

## IV.  ORDER

For the reasons set forth above, the court remands the case under sentence four of section 405(g). The ALJ should consider the impact of Jameson's mental impairments on his ability to work. The ALJ should also develop the record further concerning Jameson's mental health status and abilities. If the ALJ finds Dr. Snyder's opinion and conclusions suspect, he should order further examination.

DATED:          12/1/05                              /s/ Ronald M. Whyte
                                                     RONALD M. WHYTE
                                                     United States District Judge

Copy of order e-mailed on _____12/1/05_____ to:

Tom F. Weathered
Law Office of Tom Weathered
999 16th St #7
San Francisco, CA 94107-2468
(415) 865-0399

    Counsel for plaintiff

Sara Winslow
U.S. Attorney's Office
450 Golden Gate Avenue
10th Floor, Box 36055
San Francisco, CA 94102
415/436-6925

    Counsel for defendant